HOCKING et al. v. HAMILTON et al.

(Circuit Court of Appeals, Third Circuit. May 12, 1903.)

No. 29.

1. SALE—FORMAL EXECUTION OF CONTRACT—WAIVER—JURY QUESTION.
   Evidence in an action for damages for the breach of a contract for the sale of coal examined, and *held* to warrant submitting to the jury the question whether a formal execution of the contract had been waived by the seller.

2. TRIAL—SUBMISSION OF QUESTION TO JURY.
   Where different minds may honestly draw different conclusions from the same facts, the case is one for the jury.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

W. H. Ruppel, for plaintiffs in error.

Johns McCleave and Frederick Dallam, for defendants in error.

Before DALLAS, Circuit Judge, and BUFFINGTON and KIRKPATRICK, District Judges.

BUFFINGTON, District Judge. This is a writ of error to the Circuit Court for the Western District of Pennsylvania. In that court the defendants in error, Hamilton & Co., brought suit against John T. Hocking and George H. Duncombe, trading as the Hocking & Duncombe Coal Company, for damages for breach of contract to deliver coal, and therein recovered a verdict for $4,775.51. The re-

fusal of the court to give binding instructions for the defendants, to the effect that no contract existed between the parties, is here assigned for error. An examination of the proofs satisfies us that it was the duty of the trial judge to submit that question to the jury, for the facts proven by the plaintiffs were such that therefrom a jury could conclude a contract existed. To those facts we briefly refer: The plaintiffs were coal dealers in Baltimore; the defendants, miners and shippers of coal in the Somerset region of Pennsylvania. On March 28th the plaintiffs telegraphed defendants: "Telegraph whether or not we can count on your coal for coming year. Important." To which an answer was received: "Will agree to ship fifty thousand tons to take effect when article is signed. Hocking & Duncombe Coal Co." The same day both the parties wrote in confirmation of the telegrams, the defendants stating "the conditions which must appear in contract"; the plaintiffs saying:

"We understand from same that you have decided to accept $1.00 per ton for 50,000 tons, same to start from date contract is signed. This is satisfactory to us, and we beg to ask whether you will have contract drawn up or shall we attend to same and submit it to you for any correction if necessary."

On March 30th Hamilton & Co. inclosed a draft of contract—

"Which we submit for your consideration. * * * The contract as drawn is a fair one and if satisfactory to you please sign and return. If you desire any reasonable corrections please advise."

On March 30th, Hocking, one of the partners, and signing himself as superintendent, writes:

"We have made notations and erasures upon one copy (which we herewith return) which about expresses the terms upon which we will contract. The one feature upon which the agreement hinges is in relation to car supply, and guarantee to take not less than 4,000 tons per month."

On April 2d, Hamilton & Co. telegraphed Hocking to have the contract drawn, or to come to Baltimore, so that the matter could be arranged to his satisfaction. On the same day Hocking replied: "Can't get away. Have agreement as noted. Expect resumption soon." On the same day Hamilton & Co. wrote: "We are having contract drawn again to agree with your corrections, and will send you same to-morrow." On April 4th the suggested contract was sent by Hamilton & Co., who wrote:

"The whole matter is just this, you are willing and agree to ship us the 50,000 tons and we agree to receive and pay for the same. We instructed lawyer to draw the contract on these lines. If this paper does not meet your views we must ask that you have one drawn at your end."

It will be noted that this contract was sent April 4th; that it embodied the terms agreed on by the parties, and no change of those terms was thereafter suggested. It correctly represented the wishes of the parties, and nothing remained to be done, save the execution of the paper. It is proper here to remark that the original telegram of March 28th, stating the plaintiffs in error agreed to ship 50,000 tons, to take effect when article was signed, can refer to a signing by Hamilton & Co. as well as by Hocking & Duncombe. The purport of that message, it may be fairly contended, was that the sellers

were not willing to commence shipment until the terms of the contract were settled. Such terms having been agreed on, as embodied in the paper submitted April 4th, there is reason for saying that from that time forward both parties treated it as in force—the plaintiffs by ordering in the supply of cars, and the defendant company by furnishing the coal. It is true that during the remainder of the month Hamilton & Co. were continually urging the signing of the contract, but their actions and statements were those of men who regarded the contract as closed. Their contract was such as to bind them, and they acted as bound by the contract. This will be seen from the acts and correspondence of the parties during that period. On April 5th they wrote Hocking to wire as soon as he knew the miners would go to work, "so that we can order in cars." April 7th they wrote him: "When do you expect to commence shipments? Please fix up contract and advise when we shall order in cars." On April 7th Hocking writes: "I have not seen Mr. Duncombe since your agreement came, and am waiting for him to read it and sign it. As soon as this is done we will return it for your signature." He also asks: "Would you be willing to pay an advance price? If so, wire me." It will be noted that this advance price was one provided for by the contract. On April 9th Hamilton & Co. wired their willingness to pay 55 "so as to get miners working." On the same day Hocking telegraphed: "Order in supply of cars to-morrow." This act calling upon Hamilton & Co. to comply with their obligation under the contract to order in cars could fairly be construed as one done by Hocking in pursuance of the contract. That it was so regarded by Hamilton & Co. is apparent from their letter of the same date wherein they say, "When cars are put in divide shipments between Locust Pt. and St. George, Staten Island, until otherwise advised." That Hocking regarded the contract as in force, and that thereunder Hamilton & Co. were interested to the extent of the miners' scale allowed is apparent from his letter of April 11th, wherein he says: "We have just understood that a long train of empties were taken to Niverton & Merchants on the 60c. basis. What do you think about ordering in cars on the same basis?" After some additional correspondence, Hamilton & Co., on April 14th, wrote, and their words show that they regarded the contract as in force, as follows: "All we can tell the railroad is that we have bought some quantity of your coal and want cars for same." On April 16th there is the first intimation from Hocking of any possible trouble from Duncombe. It is in these words: "Our Mr. Duncombe is at Boynton store as soon as I get him down here will get him to sign contract if I can." But far from attaching any importance to that fact, Hocking on April 18th writes Hamilton & Co. as though he could close the matter himself. His words are as follows: "I have not seen Mr. Duncombe yet, but if he does not come down I shall have to sign the agreement myself, I expect." On April 21st Hamilton & Co. wrote—and their act may be regarded as in affirmance of the contract—as follows: "Please advise us how many cars you can load daily, so that we can take this matter up with the R. R. here and see that you are given a full supply." On April 24th, the manifest sign-

ed by Hocking, and evidencing shipments of coal to the plaintiffs, stated: "Started work to-day with 20 miners at 55c. per gross ton. I will continue shipment and get contract signed soon as Duncombe is ready." On April 25th the manifest contained this statement: "Mr. Duncombe has positively refused to sign the lease and has threatened to bring suit against me, if I persist in sending you coal, for damages. I do not know what to do." This statement is, in effect, an admission that the shipments already made had been in fulfillment of their contract. Under this state of facts, we think it was the clear duty of the trial judge to submit to the jury, whether under the correspondence and relations of the parties, the shipment of this coal was not a waiver of formal execution. The actions of Hocking might fairly be construed by Hamilton & Co. as an acceptance of the contract, and inasmuch as Hamilton & Co. had accepted the contract, and were arranging for its performance, the jury was warranted in finding there was an aggregatio mentium. The facts and the inference to be drawn therefrom were for the jury to determine.

It was contended that, under the partnership agreement between Hocking and Duncombe, the consent and signature of both parties were required to a contract for the sale of the firm's output, and that the plaintiffs knew that fact. Such knowledge was denied by the plaintiffs, and the jury has so found. Such being the case, we think, in view of the correspondence between the parties, the agreement as to the terms of the contract, the shipments of coal made, and the statements of Hocking as to signing the contract himself, the question of whether there was an agreement reached, and aggregatio mentium had, and the formal execution of the contract waived, were questions of fact for the jury, for, where different minds may honestly draw different conclusions from the same facts, the case is one for a jury. Railroad Company v. Stout, 17 Wall. 657, 21 L. Ed. 745.

The case is affirmed.